CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
SAMUEL O. CROSS (Bar No. 304718)
(E Mail: sam_cross@fd.org)
Deputy Federal Public Defender
411 West Fourth Street, Suite 7110
Santa Ana, California 92701-4598
Telephone: (714) 338-4500
Facsimile: (714) 338-4520

Attorneys for Defendant
LEAH ALSPAUGH

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| FITNESS INTERNATIONAL, LLC, <br><br> Plaintiff, <br><br> v. <br><br> LEAH ALSPAUGH, <br><br> Defendant. | Case No. 8:22-cv-01800-DOC-DFM <br><br> **EX PARTE RENEWED APPLICATION FOR IMMEDIATE RELEASE OF DEFENDANT LEAH ALSPAUGH** |

Defendant Leah Alspaugh, by and through her counsel of record, Deputy Federal Public Defender Samuel Cross, hereby asks the Court to enter an order immediately releasing Leah Alspaugh from custody because there is no legal basis for her continued detention.

//

//

1 | This Ex Parte Application is based on the attached Memorandum of Points and
2 | Authorities, and Declaration of Counsel. Undersigned counsel notified counsel for the plaintiff
3 | of his intention to apply ex parte for Ms. Alspaugh's release.  Plaintiff's counsel opposes the
4 | the ex parte nature of the application and the relief requested.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:  March 1, 2024                    By   /s/ Samuel Cross

SAMUEL CROSS
Deputy Federal Public Defender
Attorneys for Leah Alspaugh

2

## **TABLE OF CONTENTS**

Page

I. INTRODUCTION ................................................................................................2

II. RELEVANT PROCEDURAL HISTORY ........................................................3

III. ARGUMENT ....................................................................................................5

      A.    Ms. Alspaugh's ex parte filing is proper because Ms. Alspaugh is being detained indefinitely without legal cause and extraordinary relief is warranted. .........................................................................................5

      B.    Ms. Alspaugh must be released, because there is no basis for her continuing detention. ...............................................................................8

IV. CONCLUSION ...............................................................................................11

DECLARATION OF SAMUEL CROSS ..............................................................12

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.  INTRODUCTION

Ms. Alspaugh has been detained by order of this Court since at least February 5, 2024, or, to date, at least 25 days.  See Feb. 5, 2024 Minutes, ECF No. 150.  She remains detained indefinitely by order of this Court at the Santa Ana Jail.  Cross Decl. ¶ 2.

On February 15, 2024, the Court denied Ms. Alspaugh's previous ex parte application for immediate release by text-only order.[1]  ECF No. 151.  By a separate Order of even date (hereinafter the "Order of Detention"), the Court ordered Ms. Alspaugh's continued detention, pending a mental health evaluation to be conducted by the Santa Ana Jail.  ECF No. 152.  The Order of Detention cited as a basis for Ms. Alspaugh's continued detention the Court's contempt powers and Federal Rule of Civil Procedure 35.  Id.  The Order of Detention also directed Santa Ana Jail to conduct a mental health evaluation by noon on February 21, 2024.  Id.

The Order of Detention acknowledged what is (or should be) clear to the parties and the Court:  Ms. Alspaugh "in her present state . . . is unable to comply with the Court's permanent injunction."  Order of Detention 2.  By "present state," the Court appears to refer to Ms. Alspaugh's behavior toward and beliefs about Plaintiff LA Fitness ("Fitness").  As the records of this case demonstrate, Ms. Alspaugh suffers from a mental disease or defect that have caused her to act "consistently in word and deed as a person who has the unshakable, delusional belief that she owns or works at Fitness gym locations."  First Ex Parte Appl. for Release 9, ECF No. 149.  Ms. Alspaugh's "present state" is no new occurrence, but has persisted across the course of the litigation, and indeed, as the Court acknowledged at the February 5 hearing, has only escalated.  ECF No. 149-1 ¶ 6.

---

[1] The Court had previously orally indicated on February 7, 2024, at a status conference, that the Court was denying the ex parte application for immediate release at that time.  Cross Decl. ¶ 10.

2

Nevertheless, the Order states that the Court intends to hold Ms. Alspaugh in custody until she "complies [with its Orders] . . through mental health intervention." Order of Detention 2.

The Court cannot detain Ms. Alspaugh on this basis. The Court's contempt power, as the Court acknowledges, is only coercive, and if Ms. Alspaugh cannot be coerced because of her mental state, she cannot be detained. See Order of Detention 2 ("Thus [the Public Defender argues], the justification for civil contempt—coercing compliance—cannot be achieved by [Ms. Alspaugh's] continued incarceration. The Court understands the public defender's point and agrees that, in her present state, Ms. Alspaugh is unable to comply with the Court's permanent injunction.").

Nor do the Court's contempt powers, however broad, or anything in Rule 35, permit the Court to detain Ms. Alspaugh for the purpose of a mental health evaluation in this civil proceeding. It is not probable that simply evaluating Ms. Alspaugh's mental health will change her mental condition. Even if it were, it is clear that Santa Ana Jail and Wellpath, its contracted medical services provider, will not comply with the Court's order to evaluate Ms. Alspaugh. Wellpath purported to be unaware of the Court's order on February 26, 2024, five days after the Court's deadline for completion of a mental health evaluation, and, characterizing this Court's order as a "request," flatly refused to conduct any evaluation on February 29. See Cross Decl. ¶¶ 3–9.

Because the Court lacks authority to detain Ms. Alspaugh, it must release her immediately.

## II. RELEVANT PROCEDURAL HISTORY[2]

Ms. Alspaugh's previous ex parte application for immediate release was filed on February 7, 2024, two days after she was first brought before the Court after having been arrested on a civil contempt warrant. ECF No. 149. At a status hearing conducted the same

---

[2] This recitation of the factual and procedural history of the contempt proceedings related to Ms. Alspaugh is abbreviated. This history is laid out in greater detail in Ms. Alspaugh's original ex parte application for immediate release. See ECF No. 149. The history recounted herein relates only events that have occurred since Ms. Alspaugh's first ex parte application.

3

1 day, the Court stated orally that it was denying Ms. Alspaugh's ex parte application. Cross
2 Decl. ¶ 10. The Court continued the status hearing to February 15, 2024, and Ms. Alspaugh
3 remained incarcerated. Id.; ECF No. 150.

4       At the February 15 status hearing, and by subsequent written order, the Court again
5 denied Ms. Alspaugh's ex parte application for immediate release. ECF No. 151. The Court
6 also issued the Order of Detention on February 15, noting that "[t]he purpose of civil contempt
7 is to coerce the contemnor into compliance with the Court's orders," and agreeing that
8 because of her mental condition, Ms. Alspaugh was "in her present state" unable to comply
9 with the Permanent Injunction regarding Fitness that the Court had previously issued. Order
10 of Detention 1, 2. The Order of Detention then stated:

> 11 The Court finds that the only way to ensure that Ms. Alspaugh complies is through
> 12 mental health intervention. For this reason, pursuant to Federal Rule of Civil Procedure
> 13 35, the Court ORDERS Ms. Alspaugh to submit immediately to a psychological
> 14 evaluation at the Santa Ana Jail. The Court orders a report regarding this examination be
> 15 produced by noon on February 21, 2024.
>
> 17 The mental health evaluation is not punitive. Last time Ms. Alspaugh was in
> 18 custody in July and August 2023, she submitted to a mental health evaluation. After this
> 19 evaluation, she was able to have a lucid conversation with the Court. It appears that a
> 20 mental health evaluation is the only way to ensure that Ms. Alspaugh can understand the
> 21 nature of these proceedings and her obligations under the Court's permanent injunction.
> 22 In this respect, such evaluation appears to be the only way to coerce compliance with the
> 23 Court's orders.

24 Id. at 2. No status hearing was set and Ms. Alspaugh remained detained.
25       An investigator for the Federal Public Defender contacted the Santa Ana Jail and
26 Wellpath, its contracted medical services provider, several times after the February 15 status
27 hearing. Cross Decl. ¶ 6. After the Court's February 21, 2024 deadline passed, on February
28 26, 2024, an administrative assistant at the Santa Ana Jail indicated that "Wellpath [had] not

4

1 received a recent court order for [Ms. Alspaugh]. Cross Decl. ¶ 8; Ex. A. After having been
2 provided with a copy of the Court's order by the investigator, on February 29, 2024, a "health
3 services administrator" at Santa Ana Jail responded that "[p]er [her] superiors"—unnamed—
4 "we cannot perform the request [as ordered by the United States District Court] because we
5 are not contracted to do so. . . . We cannot [even] coordinate finding and setting it up." Cross
6 Decl. ¶ 9; Ex. A.

7  Ms. Alspaugh remains incarcerated at Santa Ana Jail. No hearing is presently set in
8 this matter. No mental health evaluation has been conducted.

## III.  ARGUMENT

**A. Ms. Alspaugh's ex parte filing is proper because Ms. Alspaugh is being detained indefinitely without legal cause and extraordinary relief is warranted.**

Counsel for Plaintiff stated Fitness opposes the ex parte nature of the current filing. Plaintiff did not indicate on what basis it opposes the ex parte nature of the filing. There is no basis for such opposition.

The legal term "ex parte" generally means, of an application for judicial relief, "[a] motion made to the court without notice to the adverse party; a motion that a court considers and rules on without hearing from all sides." MOTION, Black's Law Dictionary (11th ed. 2019). The term has a more bespoke meaning in the Central District of California, and in particular, does not (necessarily) mean an application for relief requested without notice to opposing parties. See Local Civ. R. 7-19.1 ("It shall be the duty of the attorney so applying . . . to make reasonable, good faith efforts orally to advise counsel for all other parties, if known, of the date and substance of the proposed ex parte application[.]"). In any event, counsel for Fitness has notice of the relief Ms. Alspaugh proposes and has indicated her client's position. Furthermore, the instant Application was filed via the Court's CM-ECF system, which will automatically serve all parties at the same time the Court is served.

Practically, the distinction in the Central District between a noticed motion and an ex parte application is one of timing. Noticed motions are noticed for a particular date on the

Court's calendar, typically at least four weeks in the future. See Local Civ. R. 7-4. By contrast, ex parte applications must, in this Court, be opposed within 24 hours of receipt, and the Court may rule on them anytime thereafter with or without a hearing. See Standing Order 3–4, United States District Judge David O. Carter, available at https://www.cacd.uscourts.gov/sites/default/files/documents/DOC/AD/STANDING%20ORDER.pdf (accessed March 1, 2024).

While "[e]x parte applications are solely for extraordinary relief and should be used with discretion," the situation now before the Court and the relief requested are extraordinary. Standing Order 3 (citing Mission Power Eng'g Co. v. Continental Cas. Co., 883 F. Supp. 488 (C.D. Cal. 1995)). As further explained herein, Ms. Alspaugh, a defendant in a civil action filed by a gymnasium company, is being indefinitely detained, on a civil contempt theory, not despite but because of her inability to comply with the Court's order. See Order of Detention 2 ("The Court finds that the only way to ensure that Ms. Alspaugh complies is through mental health intervention."). She is not charged with a criminal offense before this Court, and her mental health renders her unable to comply with the Court's order. See id. Every day she spends in custody is a further day of unlawful detention. No hearing is set in the matter. The one event on which Ms. Alspaugh's freedom may turn, per the Order of Detention, is a mental health evaluation conducted by the institution detaining Ms. Alspaugh. That institution flatly refuses to obey the Court's order, so she has no present prospect of evaluation, let alone release.[3] Ex parte application presents Ms. Alspaugh with her only hope of release from custody in less than four weeks.

Evidently, Fitness opposes this ex parte procedure, and will explain why in its opposition. However, to do so is not reasonable. Fitness is afraid that Ms. Alspaugh will continue to violate the Court's permanent injunction by harassing its staff or damaging its

---

[3] Unless Wellpath or Santa Ana Jail have contacted the court in a truly ex parte fashion, it is not just that these entities refused to comply with the Court's order. They did not even notify the Court or the parties to this action of their refusal, instead communicating that refusal by email to the udnersigned's investigator, referring responsibility for the refusal to comply with a Court order to unnamed "superiors. See Cross Decl. ¶ 9.

portable or real property. Fitness has already fulsomely substantiated the basis for its fear in almost a dozen filings and multiple evidentiary hearings. ECF Nos. 81, 93, 120, 122, 131, 132, 133, 134, 136, 137, 143. Fitness has already opposed Ms. Alspaugh's release on several occasions. Furthermore, Fitness is well resourced and does not seek any change in circumstances. Rather, Fitness, a wealthy company with more than 550 gym locations across the United States and Canada, has obtained a status quo whose alteration it now simply opposes.[4] That status quo, of which Fitness approves and which it seeks to preserve, is the indefinite incarceration of its civil litigation adversary, an indigent, mentally ill woman. Fitness has presented all the evidence regarding Ms. Alspaugh's it thinks is relevant to the Court's determination already, and only wishes to prevent Ms. Alspaugh's liberty, of which it has already complained at such length. Fitness will not be prejudiced by having to continue to litigate this matter next week—at which point it will no doubt simply point to all its previous filings—rather than several weeks hence. As noted above, the prejudice to Ms. Alspaugh, by contrast, is extreme and continuing.

Furthermore, there is little reason to believe that in this highly unusual situation, it is appropriate for Fitness to be heard at all regarding how Ms. Alspaugh's mental health situation should be treated by the Court. As noted above, Ms. Alspaugh is an indigent, mentally ill woman. To prevent her from harassing its employees or damaging its property, Fitness secured a judgment against her she will likely never be able to pay even a small part of, and obtained a permanent injunction it has now successfully used to have her incarcerated. Her continuing detention, however, rests not on whether Ms. Alspaugh will agree to comply with the Permanent Injunction, but

---

[4] See LA Fitness, Wikipedia: The Free Encyclopedia, https://en.wikipedia.org/wiki/LA_Fitness (accessed March 1, 2024). Although Fitness is not a publicly traded company, Fitness has steadily expanded over the last 15 years, typically by acquiring competitors in new markets, but also including, in 2020, "launch[ing a] new downmarket Esporta Fitness brand (intended to compete with high-volume, low-price gyms like Planet Fitness), and rebrand[ing] several former LA Fitness locations as Esporta Fitness, mostly based on the East coast." Id.

7

on what steps the Court can take to allow her to regain competence, or, alternatively, to protect her because she is incompetent.

Rule 17(c)(2), which Ms. Alspaugh invoked in her previous <u>ex parte</u> application for release, provides that if a civil litigant is incompetent, "[t]he court <u>must</u> appoint a guardian ad litem--or issue another appropriate order--to <u>protect</u> a minor or incompetent person who is unrepresented in an action." R. 17(c)(2) (emphasis added). The Rule recognizes that unrepresented, mentally ill and incompetent persons must have their rights in litigation protected because of the risk that those rights will be harmed by their adversaries. That has happened here. Having (further) impoverished and jailed Ms. Alspaugh, there is no reason to accept that her litigation adversary should also be permitted to probe into her mental health circumstances, request particular treatment or detention on the basis of those circumstances, or materially affect the steps the Court must now take. The Court's task now is to protect Ms. Alspaugh from Fitness, before it can do more harm. <u>See</u> Fed. R. Civ. P. 17(c)(2).

**B.    Ms. Alspaugh must be released, because there is no basis for her continuing detention.**

Ms. Alspaugh reincorporates by reference all the arguments made in her previously filed <u>ex parte</u> application for immediate release. ECF No. 149.

Material circumstances have not altered since the Court's previous denial of Ms. Alspaugh's application for release. Rather, the legal landscape has altered. The Court issued the Order of Detention on February 15. This order did two relevant things: 1) it agreed that Ms. Alspaugh cannot "in her present state" comply with the Court's permanent injunction, and determined that she is not competent; and 2) it opined that, because Ms. Alspaugh was evaluated by a mental health professional on a previous occasion she was detained, and after that evaluation, the Court determined that she would comply with its permanent injunction, another evaluation would restore Ms. Alspaugh to competency and thus "coerce compliance with the Court's orders." Order of Detention 2.

      Given the Court's first finding—that Ms. Alspaugh's mental state prevents compliance—its further finding and order—that Ms. Alspaugh must be evaluated so that she can be restored to competence—is unwarranted, and her detention on that basis is illegal.

      First, there is no basis for the Court's conclusion that merely having a mental health professional speak with Ms. Alspaugh will restore her to competence. As the Court is well aware, in a criminal setting, an incompetent defendant must by statute be sent to a Bureau of Prisons facility for restoration by medical professionals, typically by means of medication and other mental health treatment, often over a long period of time. See generally 18 U.S.C. § 4241(d). This is in accord with common sense. Simply speaking to a doctor once will not change anything about Ms. Alspaugh's mental health. Whatever the Court may have determined from its brief on-the-record conversation with Ms. Alspaugh at the time it previously released her, it is now clear, as the Court has noted, that Ms. Alspaugh suffers from a serious mental health condition. See Order of Detention 1–2. While the Court's desire to procure a "mental health intervention" on this ground is eminently understandable, a brief in-custody evaluation is not and cannot amount to such an "intervention." See id. at 2.

      As argued more fully in Ms. Alspaugh's original ex parte application, and as agreed with by the Court, if she cannot comply, the Court cannot hold her in contempt and cannot incarcerate her to obtain compliance. See Ex Parte Application for Release 4–10.

      Nothing Rule 35 or the Court's power to enforce its orders changes this. Rule 35 merely provides that, in a civil matter where a person's mental state is "in controversy," a court may order the time, place, and manner of an evaluation, and who will perform it. See Fed. R. Civ. P. 35(a)(2)(B). It is dubious whether Rule 35 is even applicable by its terms in this circumstance, where Ms. Alspaugh's mental condition is not "in

controversy" for purposes of determining any legal action.[5] Even if the rule were applicable, though, and the Court had authority to order her to submit to an evaluation, the only expedient that Court would have to compel compliance with its orders would be its contempt powers. And, as explained above and in Ms. Alspaugh's previous application for release, her inability to comply with the Court's orders precludes her detention for civil contempt of those orders. Simply identifying another lawful basis upon which the Court might order Ms. Alspaugh to do a things does not change the nature and scope of the Court's power to enforce its lawful orders.

Finally, the records of this case make clear that the institutions responsible for Ms. Alspaugh's health while she is in custody, Wellpath and the Santa Ana Jail, will not cooperate with the Court's orders regarding evaluations. See Cross Decl. ¶¶ 3–10. Not only do they refuse to cooperate with the Court's orders, they apparently refuse to inform the Court or the parties directly that they refuse to. A representative of Wellpath simply informed the undersigned's investigator that Wellpath "could not" comply with the Court's order, and attributed this notional incapacity to statements made by anonymous "superiors." Id. at 9. Wellpath and Santa Ana Jail made no filing with this Court, and no other attempt to inform the Court or the parties directly. This level of insouciance is particularly striking given that, at a previous hearing before this Court, Wellpath arranged at the Court's direction for its counsel to be present telephonically. Whatever it may eventually allow itself able to do, if given more focused reason to attend to the orders of United States District Judges, Wellpath and/or Santa Ana Jail have proven themselves reluctant and uncooperative participants in the treatment and care of the woman they have been charged with detaining. If Ms. Alspaugh's continued detention depends on Wellpath and Santa Ana Jail conducting

---

[5] The usual circumstances of the Rule's application are made clear by the other subsections of the Rule, which plainly envision adversary proceedings in which one party to civil litigation compels the right to have examined a person aligned with its litigation opponent, presumably to substantiate or refute a claim in that litigation. See Fed. R. Civ. P. 35(b) (Examiner's Report).

10

certain evaluations or providing her with certain treatment, then her incarceration will indeed be lengthy.

## IV. CONCLUSION

Because there is no legal basis for Ms. Alspaugh's continued detention, the Court must release her. The undersigned understands and shares the Court's concern that Ms. Alspaugh may violate the Court's permanent injunction if released. However, if there is no basis in law for the Court to detain a person, the Court must release that person.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: March 1, 2024    By  /s/ Samuel Cross

SAMUEL CROSS
Deputy Federal Public Defender
Attorneys for Leah Alspaugh

# DECLARATION OF SAMUEL CROSS

I, Samuel Cross, state and declare as follows:

1. I am an attorney with the Office of the Federal Public Defender for the Central District of California, appointed to represent Leah Alspaugh. I am licensed to practice law in the State of California and I am admitted to practice in this Court. I am a Deputy Federal Public Defender (DFPD). If called as a witness I could testify to the facts related below.

2. Ms. Alspaugh is currently incarcerated at the Santa Ana Jail.

3. At the February 15, 2024 status conference held in this matter, the Court ordered Ms. Alspaugh to submit to a mental health evaluation to be conducted by medical staff at the Santa Ana Jail, where she is currently incarcerated. I am aware of the Court's order both by having reviewed the two-page written order that issued after the hearing, ECF No. 152, and by having discussed the hearing with the attorney who appeared on Ms. Alspaugh's behalf at that hearing, Terra Castillo Laughton, DFPD.

4. After that hearing, Ms. Castillo Laughton and I caused an investigator employed by the Federal Public Defender, Victor Gomez, to contact the Santa Ana Jail on multiple occasions. Suspecting that the Santa Ana Jail would not comply with the Court's order, would not comply with that order promptly, or, if it complied, might not make a copy of the ordered evaluation promptly available to Ms. Alspaugh or the Court, I wanted to make sure that our investigative staff continued to press Santa Ana Jail staff for the results of the ordered medical evaluation.

5. I have been employed as a DFPD stationed in Santa Ana since November of 2021 and have dealt on several of occasions with the changing medical services contractors employed by the Santa Ana Jail to provide health care to inmates. In my experience, the current health care entity contracted with by Santa Ana Jail, Wellpath, is particularly resistant to requests by myself and my clients regarding health care for incarcerated people at Santa Ana Jail. I suspected that Wellpath and/or Santa Ana Jail would not promptly comply with this Court's order, based on my previous experience with Wellpath and its representatives.

6. Investigator Gomez contacted Santa Ana Jail requesting medical records relating to Ms. Alspaugh on February 15, 2024. He again contacted Santa Ana Jail on February 20, 2024, requesting copies of the new records of a mental health evaluation by a doctor or therapist that we expected would by that point have been conducted.

7. Attached hereto as Exhibit A are excerpts of email correspondence between Investigator Gomez and various representatives of Santa Ana Jail and/or Wellpath regarding the ordered mental health evaluation of Ms. Alspaugh.

8. As reflected in the excerpted emails, when Investigator Gomez inquired with the Santa Ana Jail on Monday, February 26, whether Jail or Wellpath staff could convey a copy of the mental health evaluation of Ms. Alspaugh—which the Court had ordered to be submitted to it by noon on February 21, 2024, five days previously—an administrative assistant at the Santa Ana Jail stated that Santa Ana Jail had not received a "recent court order for [Ms. Alspaugh]."

9. After being provided with a copy of the Court's order by Investigator Gomez, a "health services administrator" at Santa Ana Jail responded that "[p]er [her] superiors"—unnamed—"we cannot perform the request [as ordered by the United States District Court] because we are not contracted to do so. . . . We cannot [even] coordinate finding and setting it up."

10. At a status hearing conducted in this matter on February 7, 2024, the Court orally indicated that it was denying at that time Ms. Alspaugh's ex parte application for immediate release. Ms. Alspaugh remained detained after this hearing. The Court later denied the ex parte application by written order on February 15, 2024.

//
//

13

11. I communicated with Plaintiff's counsel by email on February 29, 2024. Counsel stated her client opposed both the relief requested in this application and the <u>ex parte</u> nature of the application for relief.

I swear that the forgoing is true and correct.

Executed on March 1, 2024, at Santa Ana, California.

/s/ Samuel Cross
SAMUEL CROSS